J. M. JONES COMPANY, Plaintiff-Appellant, *v.* THE DEPARTMENT OF REVENUE, Defendant-Appellee.

Fourth District   No. 15336

Opinion filed July 20, 1979.

Vonachen, Cation, Lawless, Trager and Slevin, of Peoria (James E. Konsky, of counsel), for appellant.

William J. Scott, Attorney General, of Chicago (Karen Konieczny, Assistant Attorney General, of counsel), for appellee.

Mr. JUSTICE MILLS delivered the opinion of the court:

A game of chance.

But—more particularly—was the supermarket gimmick used here taxable under the provisions of the Retailers' Occupation Tax Act?

The trial court said it was.

We agree.

The J. M. Jones Company sought to recover certain taxes paid but the Department of Revenue denied Jones' claim for credit. A complaint for administrative review was filed by Jones in the circuit court and the Department's ruling was affirmed. Hence, this appeal.

Jones operates a wholesale grocery enterprise which services stores in central Illinois, Iowa, and western Indiana. In addition to its normal wholesale operation, Jones sold a supermarket bingo-type game—called Gamerama—to its customers. This appeal challenges the application of the Retailers' Occupation Tax Act (Ill. Rev. Stat. 1977, ch. 120, pars. 440-453) to the sale of these games.

Although the facts are not in dispute, a somewhat detailed narrative of them is necessary to appreciate Jones' argument.

Two separate games are involved in this case but they were both played and administered in identical fashion. Jones purchased the games from Dansico Associates of Southfield, Michigan, at a price of $45.75 per case of tickets. All applicable Retailers' Occupation taxes were paid by Jones on this transaction with Dansico. Jones then distributed the tickets and game cards to the participating supermarkets and billed an amount of $115 for each case of tickets. This amount was based upon the statistical projections supplied to Jones by Dansico as the amount necessary to cover the cost of the tickets, to establish a cash prize account, and to pay for advertising which publicized the games during the period of their operation. Thus, $69.25 per case (the difference between $115 and $45.75) was allocated to the establishment of a cash prize account and for advertising costs.

Customers of the supermarkets obtained a game card at the checkout counter. Each card was available free of charge to the customer and had the rules of the game printed on it. On each subsequent shopping junket the customer received a ticket packet which contained four cardboard playing pieces. The playing pieces were then used to attempt to complete a row on the game card which would result in a winning card and a cash prize. The prizes ranged from $1 to $1,000.

To insure that sufficient funds were available to disburse to winning customers, Jones deposited the money received from the supermarkets

above the actual cost of the tickets into a special cash prize account. A triumphant customer submitted the winning tickets and game card to the manager's office at the local supermarket. The local market would immediately pay prizes of $1, $2, and $5, but winning game cards for larger prizes were submitted to the offices of Jones for verification by use of a special black light. Upon determination of authenticity, Jones authorized the local store to disburse the prize. Jones filed all necessary forms with the Internal Revenue Service, and also collected prize agreements and receipt forms which had been signed by the customer.

Participating supermarkets sent the prize receipt forms to Jones for weekly tabulation. Once tabulated, Jones credited the local supermarket with the amount of prizes it had awarded. This amount was then used as a credit against the store's wholesale grocery bill from Jones in the following week. Basically, Jones debited the cash prize account and entered a corresponding credit to the local store's wholesale account. At the conclusion of each game, the amount remaining uncredited in the prize account—since all winning tickets were not redeemed—was refunded on a *pro rata* basis to the local supermarkets.

During the course of the Gamerama operation, Jones billed a total of $566,490 to the local stores for 4,926 cases of tickets. Of this total figure, $303,044.44 consisted of credit for cash prizes, $21,754.50 was used to purchase advertising, and $27,123.53 was refunded to the supermarkets on a *pro rata* basis.

The Department of Revenue amended Jones' 1976 sales tax return stating that the Retailers' Occupation Tax and the Municipal Retailers' Occupation Tax were owed on the entire amount billed the supermarket less the cash refunds actually made by Jones. (The Department originally relied on its Rule 53(2) but later decided that Rule 50 was the applicable provision.)

Jones contends in this court that it was the operator of a game of chance as provided in Department of Revenue Rule 53(1) and thus exempt from the Retailers' Occupation Tax on the sale of Gamerama to the various supermarkets.

The Department of Revenue is authorized to promulgate rules and regulations relating to the administration and enforcement of the Retailers' Occupation Tax Act. (Ill. Rev. Stat. 1977, ch. 120, par. 451.) Pursuant to this grant of authority, the Department promulgated Rule 53 which provides:

"1. OPERATORS OF GAMES OF CHANCE

Persons who engage in conducting raffles or other games of chance are not engaged in the business of selling tangible personal property at retail to the extent of such activities and are not required to remit retailers' occupation tax measured by their

receipts from the operation of such games of chance. These cases must be distinguished from those in which vending machines are used for selling tangible personal property at retail (see Rule No. 26 of the retailers' occupation tax Rules and Regulations).

2. SUPPLIERS OF OPERATORS OF GAMES OF CHANCE

Persons who engage in selling tangible personal property to operators of raffles, punch boards, mechanical gambling devices and other games of chance, for disposition to players in the course of the operation of such games of chance, are engaged in the business of selling tangible personal property at retail and incur retailers' occupation tax liability when making such sales. The same is true of persons who engage in selling gambling devices themselves (such as punch boards, slot machines, wheels, paddles and other gambling devices) to operators of games of chance for use in the conduct of such games or gambling enterprises."

Although the Department initially informed Jones that its decision was based on Rule 53(2), the final decision—and that of the circuit court—was based upon a finding that the transaction was taxable under Rule 50. Department of Revenue Rule 50 provides, in relevant part:

"1. WHEN LIABLE FOR RETAILERS' OCCUPATION TAX

Persons engaged in the business of selling tangible personal property to purchasers who give such property away for premiums, advertising, prizes or for any other reason, apart from their sale of other tangible personal property or service, are engaged in the business of selling tangible personal property at retail and are liable for retailers' occupation tax when making such sales.

For example, the sale of blotters or calendars to a dealer who gives such items to others as part of a general goodwill, sales promotion or advertising campaign, apart from his sale of other tangible personal property or service, is a sale of the blotters or calendars at retail to such dealer."

■■ At the administrative hearing, the Department relied on the *prima facie* correctness of its "Notice of Tentative Determination of Claim" (Ill. Rev. Stat. 1977, ch. 120, par. 455(b)), and offered no evidence to rebut the testimony of Jones' witness. When the facts are not in dispute, their legal effect may create a matter of law for the court's determination. *Division-Kostner Currency Exchange, Inc. v. Montgomery* (1974), 18 Ill. App. 3d 225, 309 N.E.2d 614.

■■ The circuit court below, rather than adopt the Department's argument that this was not a game of chance because the players did not furnish consideration, stated that the *purpose* to be served by the rules was the appropriate consideration. And we agree. The statute controls—

not the rules. The rules of the Department are merely to aid in the enforcement and administration of the Retailers' Occupation Tax Act which places a tax upon persons engaged in the business of selling tangible personal property at retail (Ill. Rev. Stat. 1977, ch. 120, par. 441). In order for the Act to apply, there must be a sale at retail which includes:

" 'Sale at retail' means any transfer of the ownership of or title to tangible personal property to a purchaser, for the purpose of use or consumption, and not for the purpose of resale in any form as tangible personal property to the extent not first subjected to a use for which it was purchased, for a valuable consideration: * * *

'Sale at retail' shall be construed to include any transfer of the ownership of or title to tangible personal property to a purchaser, for use or consumption by any other person to whom such purchaser may transfer the tangible personal property without a valuable consideration, and to include any transfer, whether made for or without a valuable consideration, for resale in any form as tangible personal property unless made in compliance with section 2c of this Act." Ill. Rev. Stat. 1977, ch. 120, par. 440.

Jones argues that *American Airlines, Inc. v. Department of Revenue* (1974), 58 Ill. 2d 251, 319 N.E.2d 28, and *Fefferman v. Marohn* (1951), 408 Ill. 542, 97 N.E.2d 785, support its contention that its sales of Gamerama to the supermarkets are not taxable under the Act. However, those cases dealt with whether the sales contemplated a resale for a specific and valuable consideration. They are clearly distinguishable from the case at bench. It is undisputed that the supermarkets did not acquire the cards while contemplating a resale.

The Department's position is that Rule 53 was designed to exempt receipts in a situation similar to where an organization is conducting a weekly bingo game. In that case, there would normally be no transfer of ownership or title to tangible personal property which is a prerequisite to taxability under the Act. Ill. Rev. Stat. 1977, ch. 120, par. 440.

■■■ We agree that Rule 53(1) is not pristine in its clarity and should be further defined or altered to eliminate confusion in future cases. However, we must not lose sight of the fact that the authority to collect the tax derives from the tax *statute* and *not* the regulations. (*Terrace Carpet Co. v. Department of Revenue* (1977), 46 Ill. App. 3d 84, 360 N.E.2d 153.) The Department has no legal authority to limit or extend the statutory definitions by these rules and regulations. (*Gapers, Inc. v. Department of Revenue* (1973), 13 Ill. App. 3d 199, 300 N.E.2d 779.) The tax is imposed on persons engaged in the business of transferring the ownership of tangible personal property to a purchaser for use or consumption. The fact that the purchaser intends to dispense the property to its customers for promotional purposes is without relevance. Also, the

intrinsic value of this property to the recipient is of no consequence. Jones' sales to the supermarkets were sales at retail (as that term is defined by the Act) and were thus properly taxable.

■■ Jones next argues that the Department was incorrect in computing its tax liability based upon the total amount billed to the supermarkets. Since the only tangible personal property transferred to the supermarkets was the game cards and tickets, Jones contends that the tax should be based upon only the price of these items, or $45.75 per case. The additional amount of $69.25 per case, it is urged, was used to establish a prize account and advertise the game and did not involve the transfer of tangible personal property. It is Jones' further contention that it did not get title to this additional amount until it was credited to the wholesale grocery order of its customers, and until that time it was merely acting as an escrow agent.

We cannot accept this rationale.

The Retailers' Occupation Tax is to be computed upon the gross receipts from the sales of tangible personal property. (Ill. Rev. Stat. 1977, ch. 120, par. 441.) The gross receipts are measured by the total selling price of the property. (Ill. Rev. Stat. 1977, ch. 120, par. 440.) The selling price of the property is defined as:

> "[T]he consideration for a sale valued in money whether received in money or otherwise, including cash, credits, property, other than as hereinafter provided, and services, but not including the value of or credit given for traded-in tangible personal property where the item that is traded-in is of like kind and character as that which is being sold, and shall be determined without any deduction on account of the cost of the property sold, the cost of materials used, labor or service cost or any other expense whatsoever * * *." Ill. Rev. Stat. 1977, ch. 120, par. 440.

In discussing this statutory definition, the Illinois Supreme Court has stated:

> "The language employed is not only free from ambiguity but is specific to the effect that the 'selling price' or the 'amount of a sale' is to be determined without any deduction on account of the cost of the property sold, the cost of materials used, labor or service costs, or 'any other expense whatsoever.' These words are all-embracing in their scope. [Citation.]" *Vause & Striegel, Inc. v. McKibbin* (1942), 379 Ill. 169, 172, 39 N.E.2d 1006, 1008.

Here, the amount of the charge exceeding the cost of the tickets was an inseparable part of the transfer of tangible personal property, not merely incidental to it, and was properly included in computing the tax. *Gapers, Inc.*

Jones did not offer to sell the tickets to the supermarkets for $45.75

per case. The supermarkets purchased the entire game package or they purchased nothing at all! The Department was correct in computing the tax on the basis of total consideration for the sale.

Affirmed.

CRAVEN and TRAPP, JJ., concur.